Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1      any time, just let me know, and I will try to remember to
 2      speak up.
 3           Generally, the nature of working in the building
 4      envelope construction industry is you are not called out
 5      to buildings that don't show some signs or issues.  So I
 6      would say all had some indications of water damage.
 7   Q  (By Mr. Derrig)  Are you aware of any set of atmospheric
 8      conditions that causes no damage whatsoever to any part
 9      of a building?
10                     MR. HOUSER:  Objection; vague,
11      compound.
12   Q  (By Mr. Derrig)  It doesn't matter how minute the damage
13      is, no damage whatsoever.
14   A  I'm just -- I'm sorry.  Can you repeat the question?
15   Q  Are you aware of any set of atmospheric conditions that
16      causes no damage, however minute, to a building?
17                     MR. HOUSER:  Objection; vague,
18      compound, incomplete hypothetical.
19   Q  (By Mr. Derrig)  If that's too abstract for you, I can
20      make it concrete.
21   A  Okay.  Please, if you could.
22   Q  Well, I'm thinking that, you know, even on a nice, sunny
23      75-degree day, you could still have UV exposure to
24      roofing materials that would cause some degradation or
25      that could promote -- the warmth could promote the growth
```

Page 15

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1      of fungus, things like that.
 2             So what I'm wondering, having giving you that
 3      example, what I'm wondering is is there some set of
 4      atmospheric conditions where nothing happens to the
 5      building, it has no effect whatsoever, detrimental effect
 6      whatsoever on a building?
 7                     MR. HOUSER:  Objection; lacks
 8      foundation, vague, compound.
 9  Q   (By Mr. Derrig)  Are you aware of any set of atmospheric
10      conditions?
11                     MR. HOUSER:  Incomplete hypothetical.
12                     THE WITNESS:  No, no.
13  Q   (By Mr. Derrig)  Of the 10 or so buildings that you've
14      inspected that were similar to -- and I recognize that's
15      an approximation -- Eagle Harbour, do you recall the
16      names of any of the others?
17  A   I don't specifically recall the names.
18  Q   And to make sure we're talking about the same thing, I
19      guess I said that, you know, the same age and
20      construction.  What did that mean to you?  I guess the
21      age is self-explanatory.  But I'm wondering what -- I
22      said similar construction.  What did that mean to you?
23  A   So I interpreted that to mean stucco clad, exterior
24      stucco clad, things of that --
25  Q   Wood framing?
```

Page 16

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

1  **A**  **The length varied.  This one, the actual content of the**
2      **report is 32 pages.  That's not that unusual.  And it**
3      **includes just sort of a summary of each of the test cuts,**
4      **and then a good portion of the data is actually the**
5      **weather data for the -- that we accumulated for the site.**
6  Q  Where did you get the weather data from?
7  **A**  **Zephyr Delahunt.  That's one of the pieces that Zephyr**
8      **Delahunt assembled.  I believe what he told me is he got**
9      **it from the NOAA weather site, but I would have to be --**
10     **I would have to check to make sure.**
11 Q  Do you recall preparing any other reports where you
12    appended weather data like this to the report?
13 **A**  **I personally don't recall.**
14 Q  Why did you append weather data to this report?
15 **A**  **I believe that was suggested by Ken Strauss to support --**
16    **well, to indicate the general weather conditions at the**
17    **site.**
18 Q  Do you recall having any conversations with Mr. Strauss
19    about the scope or content of the report?
20 **A**  **I recall having conversations with him about the report.**
21    **I don't recall a specific.**
22 Q  Do you have any recollection of the content of any of
23    these conversations with Mr. Strauss about the report?
24 **A**  **I don't recall the specific content of the conversations.**
25 Q  Well, there's specific content, and there's content.  So

Page 58

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1       I'm wondering if you have any recollection of any content
 2       whatsoever other than you know there was a conversation
 3       and the report was being talked about.
 4   A   I recall him requesting that we include the weather data.
 5       And I guess I recall -- I guess that's really all I
 6       recall.
 7   Q   Do you recall --
 8   A   Sorry.  Go ahead.
 9   Q   No, I'm sorry.  Please complete your question --
10   A   No --
11   Q   -- or your answer.
12   A   -- that's my answer.
13   Q   Do you recall him requesting any references to -- in the
14       report to weather conditions or wind-driven rain?
15                    MR. HOUSER:  And I'm going to instruct
16       you not to answer any questions about drafting of the
17       report, any communications you had with Mr. Strauss about
18       drafting of the report, because you were an expert
19       witness at the time, and it's my understanding that under
20       Rule 26, communications about drafting of expert reports
21       are not discoverable.
22                    MR. DERRIG:  This is like the opposite
23       of -- so now he's a litigation expert?
24                    MR. HOUSER:  No, he's not.  But at the
25       time when he wrote his report, he was -- had been
```

Page 59

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

 1  Q    Do you have any reason to believe that the presence of
 2       widespread moisture intrusion at the Phase I building was
 3       a recent phenomena?
 4                 MR. HOUSER:  Objection; vague.
 5                 THE WITNESS:  I don't have any reason
 6       to believe it was a recent one, no.
 7  Q    (By Mr. Derrig)  Do you have any reason to believe that
 8       the moisture intrusion -- or excuse me -- that widespread
 9       moisture intrusion at the Phase I building was a
10       long-term phenomena?
11                 MR. HOUSER:  Objection; vague, lacks
12       foundation.
13                 THE WITNESS:  I believe in this, we
14       state that we thought that moisture intrusion had been
15       going on for a prolonged period of time.  We were no more
16       specific than that in our analysis.  And we based that on
17       the level of degradation of some of the materials that we
18       found in the test sites.
19  Q    (By Mr. Derrig)  So in BET&R's opinion, the damage could
20       be qualified as gradual impairment to the structure?
21                 MR. HOUSER:  Objection; vague, lacks
22       foundation.
23                 THE WITNESS:  Again, I'm not qualified
24       to comment as to structural impairment.  But if you are
25       -- sorry.  Go ahead.

Page 62

Aaron D. McIntosh
October 5, 2016

**EXHIBIT E**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

 1  Q   (By Mr. Derrig)  I wasn't limiting it to structural
 2      impairment.  So, you know, the stuff you are talking
 3      about here, moisture-related damage, deconsolidation, you
 4      know, decay, that sort of thing, would you classify that
 5      as gradual impairment to the building?
 6              MR. HOUSER:  Objection; vague.
 7              THE WITNESS:  I don't know what the
 8      term "gradual impairment" means.  Does that mean that it
 9      occurred over some period of time?
10  Q   (By Mr. Derrig)  Yes.
11  **A   Yes.  I would say it occurred over some period of time --**
12  **    some extended period of time.**
13  Q   Do you have any opinion as to whether that period of time
14      goes all the way back to 1979?
15  **A   I was not asked to analyze that, and I never formed an**
16  **    opinion about that.**
17  Q   Do you have any opinion as to whether that period of time
18      extends back to September, 1997, through September, 1998?
19  **A   Again, I wasn't asked to analyze that, and I don't have**
20  **    an opinion about it.**
21              MR. DERRIG:  I think we're at 11:45.
22      Do you want to break for lunch and then get back to it?
23              MR. HOUSER:  Sure.
24                  (Recess from 11:43 to 12:40.)
25      ///

Page 63
Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1  Q    So rainwater wouldn't reach the vertical surfaces without
 2       some sort of horizontal component being imparted to the
 3       rain?
 4  A    Correct.
 5  Q    But the rain would still reach horizontal surfaces that
 6       weren't covered, correct?
 7                    MR. HOUSER:  Objection; lacks
 8       foundation.
 9  Q    (By Mr. Derrig)  For instance, the surface of a deck?
10  A    I guess you would have to ask me more specifically about
11       specific decks.  I don't know -- I mean, so that question
12       assumes that there's no overhang or other -- so should I
13       assume in this scenario that there's no overhang and
14       nothing else protecting the deck?  Is that -- I guess is
15       that the question?
16  Q    Yes, an uncovered horizontal surface will be impacted by
17       rainwater without -- a wind component is not necessary
18       for that surface to be impacted by rainwater, correct?
19  A    Yes, I -- well, can you define -- I guess can you define
20       impacted?  Are you just saying water reaching that
21       surface or are you saying --
22  Q    Yes --
23  A    -- damage occurring at that surface?
24  Q    A fair question.
25            I just meant rain will hit a horizontal -- an
```

Page 66

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

```
 1     unprotected horizontal surface even in the absence of
 2     wind, correct?
 3                    MR. HOUSER:  Objection; lacks
 4     foundation and incomplete hypothetical.
 5                    THE WITNESS:  If I understand your
 6     question correctly, yes.
 7  Q  (By Mr. Derrig)  Would you agree that wind-driven rain is
 8     a typical component of the Pacific Northwest climate?
 9                    MR. HOUSER:  Objection; vague, lacks
10     foundation.
11                    THE WITNESS:  Based on our -- the
12     weather data we create -- we -- sorry.  Based on the
13     weather data that we accumulated or researched, I would
14     say yes, it's a fairly typical condition.
15  Q  (By Mr. Derrig)  Well, you can also base that on your 45
16     years of growing up in the Pacific Northwest, can't you?
17  A  I would say yes.
18  Q  Okay.
19  A  Based on that as well.
20  Q  Okay.  Some of these questions are softballs.  Okay?
21     Knock them out of the park.
22        In the next sentence under the Summary of Findings,
23     you say that, "At five locations paper-faced gypsum
24     exterior sheathing was significantly deconsolidated as a
25     result of repeated wetting and drying."
```

Page 67

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1                    THE WITNESS:  In this particular case,
 2       I don't recall if we had a conversation about whether it
 3       was still able to perform its intended function.
 4  Q    (By Mr. Derrig)  I'm not sure that answered my question.
 5            Does the March 15 report with respect to
 6       deconsolidation of gypsum exterior sheathing, is it
 7       making an assessment of the ability of that sheathing to
 8       accomplish its intended purpose at the building?
 9  A    No.
10  Q    Okay.  Going back to that same sentence, you state, "It
11       was deconsolidated as a result of repeated wetting and
12       drying."  What about the deconsolidation or -- how were
13       you able to reach the conclusion that the deconsolidation
14       was a result of repeated wetting and drying?
15  A    As I recall, sort of drawing on our experience and the
16       degree of deconsolidation, in other words, the thickness
17       of the gypsum and the tactile softness of the gypsum, we
18       were comfortable making some assessment as to it having
19       had to have happened repeated times.
20            Going back to your hypothetical of the wood, one
21       time is not going to do much damage.  But repeated
22       wetting over time and when materials hold moisture for a
23       long period of time, they tend to deconsolidate.  In this
24       case, in the case of gypsum, it will tend to swell and
25       deconsolidate more as time goes on.
```

Page 70

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1  Q   Okay.  So you were confident this wasn't just the result
 2      of some single storm passing through and a one-time
 3      unusual experience?
 4  A   That's certainly the conclusion I reached when I wrote
 5      the report.
 6  Q   And is it fair to say that you, based on the information
 7      that you have, that you can't offer an opinion as to how
 8      often -- you can't count the number of times it was wet
 9      -- the gypsum was wetted and then dried?
10  A   That's correct, I can't.
11  Q   Okay.  Going on at the summary of findings, you say, "At
12      the remaining two locations opened, oriented strand board
13      (OSB) sheathing present at the test openings showed
14      similar extensive moisture-related damage, including
15      deconsolidation and visible fungal growth (VFG)."
16          What's the deconsolidation mechanism for oriented
17      strand board?  How does that relate to moisture damage?
18  A   So, again, just to reiterate, I'm not a wood scientist.
19      I'm not a wood science expert.
20  Q   Right.
21  A   So this is my best understanding.  So the way that -- as
22      I understand, the way that oriented strand board is
23      created, it's more absorbent than, say, plywood or -- and
24      so it tends to swell and deconsolidate to a greater
25      degree than those do.  And it's a good indication -- so
```

Page 71

Aaron D. McIntosh
October 5, 2016

EXHIBIT E

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1       it's a good indication when there's moisture intrusion.
 2       It tends to show moisture intrusion in a very dramatic
 3       way.  I'm sorry.  Did that answer your question?
 4  Q    Sure.  It helps.
 5  A    Okay.
 6  Q    Are we looking at -- you say it was similar extensive
 7       moisture-related damage.  I'm wondering is this another
 8       situation similar to the paper-faced gypsum where it
 9       would have been repeated wetting and drying?
10  A    Yeah, I think that's -- I think that was the intent of
11       that sentence, yes.
12  Q    Okay.  So actually for the drying part, there's another
13       climatological condition that's at play here, and that is
14       temperature, correct?
15  A    Yeah, I suppose so.
16  Q    It warms up and the water --
17  A    It warms up and the water dries out to some degree, yeah.
18  Q    Okay.  And you also mentioned visible fungal growth.
19       First, you are not a wood decay expert, correct?
20  A    Correct.
21  Q    And you are not -- what is the name?
22                    MR. HOUSER:  An industrial hygienist?
23                    MR. DERRIG:  No, no, no.
24  Q    (By Mr. Derrig)  A mycologist?
25  A    Correct.
```

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1      understand you are still under oath?
 2   A  I do.
 3   Q  Can you identify any damage at Phase I or Phase II that
 4      is associated with a specific weather event?  In other
 5      words --
 6   A  Not that I can -- a specific weather event?  I can't
 7      recall any instance of damage that would have been
 8      associated with a specific -- one specific weather event.
 9                    MR. DERRIG:  Okay.  Thank you.
10
11                         EXAMINATION
12      BY MR. GAWLOWSKI:
13   Q  Mr. McIntosh, my name is Rich Gawlowski.  I represent
14      Allstate.  We met a few weeks ago.
15   A  We did.
16   Q  I'll be brief.
17          First of all, with respect to Phase I and Phase II,
18      are you able to determine when any physical damage you
19      saw at any location at Phase I or Phase II occurred?
20                    MR. HOUSER:  Objection; vague,
21      compound, lacks foundation.
22   Q  (By Mr. Gawlowski)  Do you understand what I mean by that
23      question?
24   A  Can you repeat it?
25   Q  Yes.  It's real simple.  There's been testimony today
```

Page 107

Aaron D. McIntosh
October 5, 2016

**EXHIBIT E**

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

```
 1     where you've testified at length about physical damage in
 2     different locations, correct?
 3  A  Correct.
 4  Q  All right.  Are you able to identify when the physical
 5     damage at any location at either Phase I or Phase II
 6     occurred?
 7                    MR. HOUSER:  Objection; vague,
 8     compound, lacks foundation.
 9                    THE WITNESS:  I have not been asked to
10     make that determination professionally, and I don't have
11     the information at this point to make that determination.
12  Q  (By Mr. Gawlowski)  When you were out there in 2004 and
13     observed any physical damage you observed at that time,
14     do you know or are you able to say when that occurred?
15                    MR. HOUSER:  Object to the
16     mischaracterization, lacks foundation.
17                    THE WITNESS:  Not specifically.
18  Q  (By Mr. Gawlowski)  The same thing with regard to any
19     physical damage that was observed beginning in 2004 -- or
20     in the 2004 timeframe -- strike that.  Let me go back.
21        I meant to ask 2004, 2006 or '07 timeframe, any
22     physical damage you observed, you are not able to tell
23     when that occurred; is that a fair statement?
24                    MR. HOUSER:  Objection;
25     mischaracterization, vague, compound, lacks foundation.
```