1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

UNITED STATES DISTRICT COURT
7
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

EAGLE HARBOUR CONDOMINIUM          CASE NO. C15-5312-RBL
9   ASSOCIATION,

ORDER
10              Plaintiff,

11          v.

12   ALLSTATE INSURANCE COMPANY,          DKT. ##12O, 13O, 131, 137, 139,
et al.,                                141
13
Defendants.
14

15      THIS MATTER is before the Court on the following motions:

16   •   Defendant Fireman's Fund Insurance Company's Motion for Summary Judgment [Dkt.
#120];
17   •   Defendant St. Paul Fire and Marine Insurance Company's Motion for Summary
Judgment [Dkt. #130];
18   •   Plaintiff Eagle Harbour Condominium Association's Motion for Partial Summary
Judgment against St. Paul [Dkt. #131];
19   •   Eagle Harbour's Motion for Partial Summary Judgment against Commonwealth
Insurance Company [Dkt. #137];
20   •   Defendant Commonwealth's Motion for Summary Judgment [Dkt. #139]; and
•   Defendant Eagle West Insurance Company's Motion for Partial Summary Judgment
21      [Dkt. #141].

22

23

24

1    Plaintiff-Insured Eagle Harbour Condominium Association sues Defendants St. Paul,

2  Commonwealth, Fireman's Fund, and Eagle West each for denying that its policy[1] covered

3  hidden water damage at the Eagle Harbour Condominium complex. The complex comprises two

4  buildings on Bainbridge Island built in the late seventies and early eighties. At one building, the

5  exterior walls are clad with cement plaster stucco over building paper over gypsum sheathing. At

6  the other, the exterior walls are clad with cement plaster stucco over building paper attached

7  directly to the framing.

8    Six companies have insured the complex:

9    Allstate (September 1, 1988–97 and September 1998–2005);

10    St. Paul (September 1, 1997–1998);

11    Commonwealth (August 31, 2005–06 and August 31, 2006–07);

12    Farmers (August 31, 2005 to March 1, 2010);

13    Fireman's Fund (March 1, 2010–11 and March 1, 2011–12); and

14    Eagle West (March 1, 2012–13, March 1, 2013–14, and March 1, 2014–15).

15  The Association has settled its claim with Allstate and Farmers, but sues the other four. The

16  Defendants' policies are "all-risk" policies that cover all fortuitous losses not explicitly excluded.

17  Commonwealth's all-risk policy is a supplemental, difference-in-conditions policy that explicitly

18  excludes coverage for any losses contemporaneously covered by Farmers.

19    The Association claims the Defendants wrongfully denied it coverage. It asserts wind-

20  driven rain and inadequate construction allowed water to penetrate the buildings' sheathing and

21  framing, causing decades of deterioration and decay, until the damage was exposed to view in

22

23
    [1] Even though most Defendants issued the Association more than one policy, the Court

24  will refer to each Defendant's policies in the singular, for ease.

August 2014. It claims the damage was incremental and progressive and occurred during each policy period, worsening with each of 60 storm events. The testimony of its expert, Michael Ludwig, and the technical consulting firm that investigated the buildings' damage, Building Envelope Technology & Research (BET&R), supports its claims.

Broadly, the Defendants claim the Association's loss results from its poor decisions to construct and inadequately maintain a stucco building in the wet and windy Pacific Northwest. Each argues it appropriately denied coverage because no covered peril caused the Association's loss. Eagle West, St. Paul, and Commonwealth each argue its policy excludes coverage for weather-related water damage, and even if it does not, wind-driven rain is not a fortuitous, covered peril. Commonwealth also argues it is not liable for the Association's loss because Farmers' policy covered it. Fireman's Fund argues the Association cannot demonstrate any damage commenced during its policy period.

The Association argues the Defendants' policies do not explicitly exclude, so cover, damage caused by wind-driven rain. It asks the Court to engage in an efficient proximate cause analysis to determine that no matter whether inadequate construction or wind-driven rain caused its loss, the loss is covered. It also argues the Defendants are joint and severally liable for its loss.

## I.    DISCUSSION

### A.    Standard of Review.

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Anderson v.*

1    *Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *see also Bagdadi v. Nazar*, 84 F.3d 1194,

2    1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence

3    for a reasonable factfinder to find for the nonmoving party. *See Anderson*, 477 U.S. at 248. The

4    inquiry is "whether the evidence presents a sufficient disagreement to require submission to a

5    jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

6    The moving party bears the initial burden of showing no evidence exists that supports an element

7    essential to the nonmovant's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once

8    the movant has met this burden, the nonmoving party then must show the existence of a genuine

9    issue for trial. *See Anderson*, 477 U.S. at 250. If the nonmoving party fails to establish the

10   existence of a genuine issue of material fact, "the moving party is entitled to judgment as a

11   matter of law." *Celotex*, 477 U.S. at 323–24.

12   **B.      Interpreting Insurance Contracts.**

13          "Interpretation of language in an insurance policy is a question of law." *Siena Del Lago*

14   *Condo. Ass'n v. Am. Fire & Cas. Co.*, No. C12-251 TSZ, 2013 WL 2127137, at *2 (W.D. Wash.

15   May 14, 2013), *aff'd*, 639 F. App'x (9th Cir. 2016) (citing *Vision One, LLC v. Phila. Indem. Ins.*

16   *Co.*, 174 Wn.2d 501, 276 P.3d 300, 305 (2012)). The Court interprets the language as a normal

17   consumer would. *See Moeller v. Farmers Ins. Co. of Wash.*, 173 Wn.2d 264, 272, 267 P.3d 998,

18   1002 (Wash. 2011). It evaluates whether a policy covers a loss in two broad steps: It considers

19   whether the insured has shown that the claimed loss falls within the policy's scope, and if so, it

20   considers whether the insurer has demonstrated that the policy excludes the loss. *See Babai v.*

21   *Allstate Ins. Co.*, No. C12-1518-JCC, 2013 U.S. Dist. LEXIS 175336, at *4–5 (W.D. Wash. Dec.

22   13, 2013) (citing *McDonald v. State Farm Fire & Cas. Co.*, 119 Wn.2d 724, 730, 837 P.2d 1000,

23   1003–04 (1992)). The Court also strictly construes exclusions and ambiguities against the insurer

24

1   and assigns undefined terms their ordinary meaning. *See Siena Del Lago*, 2013 WL 2127137, at

2   *3; *see also Allstate Ins. Co. v. Raynor*, 143 Wn.2d 469, 476, 21 P.3d 707, 711 (2001). If it

3   concludes specific policy language excludes the claimed loss, the insurer avoids payment.

4        A court begins assessing whether coverage exists by distinguishing amongst perils,

5   considering the factual circumstances of an event and the parties' contractual intent. *See*

6   *Sunbreaker Condo. Ass'n v. Travelers Ins. Co*., 79 Wn. App. 368, 376, 901 P.2d 1079, 1083

7   (1995), *as amended on denial of reconsideration* (Nov. 27, 1995) ("[C]haracterization of perils

8   focuses on whether the events are contractually distinct, with reference to specific policy

9   language and [to] the perils allegedly involved in the particular factual setting. For even if two

10  events are a single peril for purposes of a particular contract, the same exact events might be

11  distinct perils under another."). For example, whether "flood" and "rain" are a single peril or two

12  separate perils is a question of contract. *See id.* A loss may even constitute a peril sometimes, but

13  only if it is separate and distinct from the peril that caused it. *See Vision One, LLC v.*

14  *Philadelphia Indem. Ins. Co*., 174 Wn.2d 501, 518, 276 P.3d 300, 308 (2012). For example,

15  "collapse" caused by rotted wood and affecting no other structure is a "loss" only because

16  decreasing structural integrity is the natural end result of deterioration and decay, but collapse

17  that in turn damages another structure or person, constitutes a loss and a peril. *See Sprague v.*

18  *Safeco Ins. Co. of Am*., 174 Wn.2d 524, 530, 276 P.3d 1270, 1273 (2012). A court next

19  determines which identified perils are covered and which are excluded. *See Wright v. Safeco Ins.*

20  *Co. of Am.*, 124 Wn. App. 263, 271, 109 P.3d 1, 5 (2004).

21  **C.      Distinguishing Perils.**

22        The Association identifies four possible efficient proximate causes for its loss: inadequate

23  construction, wind-driven rain, repeated seepage of water, and rot or deterioration. Eagle West,

24

1   St. Paul, and Commonwealth each argue the Court need not engage in an efficient proximate

2   cause analysis because no covered peril could have caused the Association's loss. Eagle West

3   argues it does not cover inadequate construction, wear and tear, rot or deterioration, or repeated

4   seepage of water, which it argues includes decades of wind-driven rain. St. Paul argues the

5   Association's loss is excluded under its policy's wear and tear, deterioration, and latent defect

6   exclusions. It argues its deterioration exclusion includes the perils of weather and repeated water

7   seepage. Commonwealth argues it does not cover inadequate construction, and wind-driven rain,

8   a typical Pacific Northwest occurrence, cannot be a distinct peril. But if the Court disagrees, it

9   argues, the ultimate question of what caused the Association's loss is for the jury.

10          The Association counters that wind-driven rain is a distinct and fortuitous peril that none

11   of the policies exclude. It argues Eagle West covers wind-driven rain because its weather

12   exclusion does not exempt it, and Eagle West's failure to exclude covered perils that combine

13   with inadequate construction to concurrently cause a loss evidences its intent to cover losses

14   caused by wind-driven rain coupled with inadequate construction. It argues St. Paul's policy

15   covers its loss because weather and repeated seepage of water are distinct from deterioration.

16   Finally, the Association argues weather is a fortuitous peril, because if it were not, insurance

17   policies would not bother to explicitly exclude it, but most do.

18          When two or more distinct perils cause a loss and at least one is covered, courts apply the

19   efficient proximate cause rule—a rule of contract construction that asks a court to determine

20   whether a covered peril is the predominant cause of a loss. *See Sunbreaker*, 79 Wash. App. at

21   1083; *see also Vision One*, 174 Wn.2d at 519. If it is, the rule mandates coverage although an

22   uncovered loss appears in the casual chain. *See Siena Del Lago*, 2013 WL 2127137, at *3, fn. 5;

23   *see also Wright*, 124 Wn. App. at 275 ("The efficient proximate cause is that which in an

24

1  unbroken sequence and connection between the act and final loss produces the result for which

2  recovery is sought."). The rule imposes liability on an insurer for a loss efficiently caused by a

3  covered peril, even though other, excluded perils contributed to the loss. *See Safeco Ins. Co. of*

4  *Am. v. Hirschmann*, 52 Wn. App. 469, 476, 760 P.2d 969, 972 (1988)). But if the predominant

5  cause of the loss is a question of material fact—such as when multiple perils combine to cause

6  plaintiff's damage and at least one but not all are covered—"the question of which peril

7  constitutes the proximate cause is left to the factfinder." *Babai*, at *11 (citing *Kish v. Ins. Co. of*

8  *N. Am.*, 125 Wn.2d 164, 170, 883 P.2d 308, 311 (Wash. 1994)).

9        In *Sunbreaker*, a Washington appellate court considered a case factually similar to this

10  one. 79 Wn. App. 368. A condominium association sought coverage for damage caused when

11  wind-driven rain penetrated its building's stucco layer for years, causing dry rot damage. *See id.*

12  at 371. The association's all-risk insurance policy excluded faulty construction, repeated

13  seepage, and fungus, but not wind-driven rain. *See id.* at 377. The association argued wind-

14  driven rain efficiently caused the loss, and so the insurer's other exclusions had no consequential

15  effect under the efficient proximate cause rule. The insurer argued wind-driven rain and dry rot

16  constituted a single, excluded peril under the policy, and so, taken with its other exclusions, there

17  was no coverage for the dry rot. After analyzing the policy's exclusions for fungus and weather,

18  the court concluded wind-driven rain and dry rot were contractually distinct. Because wind-

19  driven rain, a covered peril, could be the efficient proximate cause of the loss, the court denied

20  summary judgment, leaving the question for the factfinder: "Proximate cause is an issue of

21  material fact precluding summary judgment." *See id.* at 380.

22

23

24

### 1.    Weather is a Distinct and Separate Peril.

Eagle West and St. Paul attempt to distinguish *Sunbreaker* to avert the Court from similarly holding wind-driven rain is a distinct, and covered, peril. Eagle West argues *Sunbreaker* does not obligate the Court to treat wind-driven rain and rainwater leakage as distinct perils because the Association has failed to associate its damage with specific storm events. St. Paul, too, argues *Sunbreaker* does not control because the court's analysis hinged on the occurrence of specific, identifiable storm events.

These arguments carry little weight. "[T]he *Sunbreaker* court stated clearly that it was not relying on the evidence of specific storm events, but rather on its conclusion that certain policy provisions evinced an intention on the part of the insurer to treat wind-driven rain as a distinct peril." *Dally Props., LLC v. Truck Ins. Exch.*, No. C05-0254L, 2006 U.S. Dist. LEXIS 30623, *11 (W.D. Wash. Apr. 5, 2006). Whether wind-driven rain is distinct from repeated water seepage and deterioration hinges on the parties' intent in their policies, based on their exclusions, not on whether the Association tied its damage to specific storm events.

Under Eagle West's policy, "repeated seepage of water" does not necessarily include decades of storm events. The repeated seepage provision excludes coverage for "[c]ontinuous or repeated seepage or leakage of water that occurs over a period of 14 days or more." Dkt. #142 (Bentson Dec.) Ex. 3 at 94. The policy also excludes coverage for losses sustained because of weather, so long as the weather event works with an act of ordinance or law, earth movement, governmental action, a nuclear hazard, power failure, war and military action, or overflowing ground water. *See* Ex. 183 (Houser Dec.) at Attachment E (Eagle West Policy). But, as an all-risk policy strictly construed for coverage, it covers all other weather events. Rain, not acting

with the listed exclusions, is therefore covered, so long as it does not leak into the property for over 14 days in duration.

"Deterioration" under St. Paul's policy does not engulf the perils of weather and repeated water seepage either. St. Paul does not cover "loss caused or made worse by" "deterioration, mold, wet or dry rot, rust or corrosion." *See* Ex. 133 (Derrig Dec.) at Attachment 1 (St. Paul Policy). "Deterioration" is undefined in the policy. Its ordinary meaning is "the action or process of deteriorating or state of having deteriorated: gradual impairment." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2582 (2002). An average insurance purchaser would reasonably read the policy to include coverage for rain events because deterioration can occur without the presence of water damage and because many insurance policies (such as Eagle West's) explicitly exclude weather and repeated water seepage. *See, e.g., Windsong Condo. Ass'n v. Bankers Standard Ins.*, No. C08-162-JCC, at *6 (W.D. Wash. Dec. 12, 2008). When strictly construed in the Association's favor, St. Paul's deterioration provision excludes coverage for deterioration but not for weather and repeated water seepage.

Therefore, under Eagle West's and St. Paul's policies, wind-driven rain is a peril distinct from repeated water seepage and deterioration. The Court must apply the efficient proximate cause rule if it is also a fortuitous, covered peril.

### 2.    Weather is a Fortuitous, Covered Peril.

Each Defendant argues against coverage, stating Eagle Harbour's damage results from (uncovered) construction defects and three decades of exposure to typical, rainy Pacific Northwest weather. Commonwealth frames this argument under the fortuitous loss principle. It argues wind-driven rain is not a fortuitous peril on Bainbridge Island, where rain is a common and expected occurrence, and as such, the losses it produces are uncovered. (Eagle West does not

1   make this argument, but joins Commonwealth's doubt about classifying Pacific Northwest

2   weather as a non-fortuitous peril.) St. Paul undercuts Commonwealth's argument slightly by

3   instead arguing fortuity is a question for the jury. It argues whether the Association knew of

4   preexisting deterioration—a fortuitous loss—in the buildings' exterior must remain for the jury.

5          The Association argues the appropriate question for the Court is not whether it

6   anticipated rain, but whether it knew of a substantial probability that hidden water damage would

7   result. It also argues weather is a fortuitous peril because insurers exclude weather-caused losses

8   when they so intend.

9          An all-risk policy covers all losses except those that are expressly excluded and those an

10  insured subjectively knew would occur—non-fortuitous losses. *See MKB Constructors v. Am.*

11  *Zurich Ins. Co*., 49 F. Supp. 3d 814, 838 (W.D. Wash. 2014); *see also Vision One*, 174 Wn.2d at

12  512. If a peril is not excluded and fortuitous, its resultant loss is covered. *See Siena Del Lago*,

13  2013 WL 212713, at *4 (citing *Vision One*, 174 Wn.2d at 513, 276 P.3d 300). For a loss to be

14  fortuitous, the insurer must demonstrate that the insured actually knew of a "substantial

15  probability" that the loss would occur. *See MKB Constructors*, 49 F. Supp. 3d at 838 (quoting

16  *Pub. Util. Dist. No. 1 v. Int'l Ins. Co.*, 124 Wn.2d 789, 881 P.2d 1020, 1031 (1994)). Whether the

17  insured had such knowledge is a question of fact. *See id.*

18         In *Babai*, the Court considered Allstate Insurance Companys's arguments that (1) damage

19  caused by rain is not a fortuitous loss because rain in the Puget Sound region is an almost certain

20  event, and (2) rain does not damage most houses, so construction defects—not weather—must

21  have caused the insured's loss. 2013 U.S. Dist. LEXIS 175336, at *10–11. The Court reasoned

22  that if Allstate's suppositions were true, there would be no reason for insurance policies ever to

23  exclude normal weather conditions from coverage, but they do. *Id.*

24

1    The Court agrees with the *Babai* decision. Many insurance policies exclude coverage for

2    weather, including storm events, evidencing its characterization as a peril that must be explicitly

3    excluded. *See, e.g., Dally*, 2006 U.S. Dist. LEXIS 30623, at *11 (citing *Pub. Util. Dist. No. 1 v.*

4    *Int'l Ins. Co.*, 124 Wn.2d 789, 805–06, 881 P.2d 2010 (1994) (Policies typically address rain,

5    and "the extent to which [a] peril is non-fortuitous is a question of fact."). Whether the

6    Association knew hidden damage from wind-driven rain would occur to a "substantial

7    probability" is a question for the jury. Otherwise, it is a covered peril.

8        The Association's loss would not have occurred without the use of stucco, construction

9    defects, and Pacific Northwest weather. Because a reasonable juror could conclude inadequate

10   construction or latent defects, repeated seepage of water, rot or deterioration, or wind-driven rain

11   efficiently caused the Association's loss, on this ground, the Association's and Eagle West's, St.

12   Paul's, and Commonwealth's Motions for Summary Judgment [Dkt. ##130, 131, 137, 139, and

13   141] are DENIED.

14   **D.     Difference-in-Conditions Coverage.**

15       Commonwealth additionally argues it is not liable for the Association's losses because

16   Farmers' policy covers interior water damage: Farmers' policy excludes losses caused by water,

17   but an ensuing loss provision recaptures coverage for interior water damage caused by rain. The

18   Association argues Farmers does not cover water damage, so Commonwealth's policy does.

19       An ensuing loss provision is an exception to a policy exclusion; it limits an exclusion's

20   scope. *See Wright*, 124 Wn. App. at 274; *see also Sprague*, 174 Wn.2d at 529. It covers losses

21   caused by excluded perils, unless the loss is subject to its own, separate exclusion. *See Wright*,

22   124 Wn. App. at 274; *see also TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578–79 (6th

23   Cir. 2010). For example, if defective wiring causes a fire, and poor construction is excluded but

24

1  fire is not, the fire damage, but not the costs to repair the wiring, will be covered. *See Wright*,

2  124 Wn. App. at 274. Courts should not read these provisions to create coverage where it

3  otherwise would not exist. *See id*.

4         Farmers' policy excludes losses caused by water, except for water damage to a buildings'

5  interior that results from a covered peril:

6
    **f.  Water, Mudslide or Mudflow**

7
        **(1)** We will not pay for loss or damage caused
directly or indirectly by any of the following:

8

9
          **(a)** Water, in any form; or
          **(b)** Mudslide or mudflow

10
  …

11
        **(2)** However, we will pay for loss or damage, not
otherwise excluded, but not for any other resulting
damage, caused by:

12

13
  …

14
          **(b)** Water damage to the interior of any building
or structure caused by or resulting from rain,
snow, sleet, ice, sand or dust, whether driven
15                by wind or not, if:

16
             **(i)** The building or structure first sustains
damage by a Covered Cause of Loss to
its roof or walls through which the rain,
17                   snow, sleet, ice, sand or dust enters; or

18
             **(ii)** The loss or damage is caused by or
results from thawing of snow, sleet or
19                  ice on the building or structure.

        . . .
20
        We will not pay for loss or damage caused by
        **(2)(a), (b), (c)** occurring over a period of 14 days
21          or more.

22  Dkt. 170 (Stein Dec.) at Ex. B. If a covered peril allowed water to damage Eagle Harbour's

23  interior, Farmer's policy covers the damage. If an uncovered peril created the opportunity,

24

1  Farmer's policy does not cover it. There, Commonwealth's policy covers the Association's loss,

2  unless its policy contains an exclusion.

3  The Court cannot determine whether Farmer's policy excludes coverage. Until a jury

4  determines the efficient proximate cause, the Court cannot ascertain whether a peril covered or

5  uncovered by Farmer's caused the loss, and so cannot determine whether Commonwealth's

6  policy affords the Association coverage on this ground or not. Commonwealth's Motion for

7  Summary Judgment [Dkt. #139] is therefore DENIED.

8  **E.      Coverage Only for Damage that "Commenced" during the Policy Period.**

9  Fireman's Fund argues it only covers damage that commenced during its policy period,

10  March 1, 2010–12, and the Association cannot demonstrate its water damage began during this

11  time because rain first penetrated the building in 1979.[2] The Association argues the loss it

12  suffered was progressive and incremental, meaning the damage worsened *and* a new loss

13  commenced with each storm event.

14  "Commencing" is an ambiguous term. *See Temperature Serv. Co. v. Acuity*, No. C16-

15  2271, 2016 U.S. Dist. LEXIS 142377, at *6 (N.D. Ill. Oct. 14, 2016). It means when damage

16  begins, not when it is discovered, *Ellis Court Apartments P'ship ex rel. Woodside Corp. v. State*

17

18

19  [2] Notably, although Fireman's alleges its policy uses the term "commencing," its
    proffered exhibits show it covers any losses "occurring" during the policy period:

20        7.  Policy Period, Coverage Territory

21          Under this Coverage Form, we cover **acci-
    dents** and **losses** occurring:

22            a.  During the policy period shown in the
    Declarations; and

23            b.  Within the coverage territory.
    Ex. 121 (Syhre Dec.) at Attachment 4. For the reasons that follow, the Court's analysis remains

24  the same, whether the operative word is "commencing" or "occurring."

1  *Farm Fire & Cas. Co.*, 117 Wn. App. 807, 814, 72 P.3d 1086, 1090 (2003), but it is still unclear

2  whether damage commences at "the first occurrence of the type of loss claimed" or at "each

3  occurrence of the loss in a series of multiple losses." *Temperature*, 2016 U.S. Dist. LEXIS

4  142377, at *6. Because an insured could reasonably read the term either way, it must be

5  construed against the insurer. *See Siena Del Lago*, 2013 WL 2127137, at *2. The exclusion

6  therefore does not apply outright.

7      Whether the Association can demonstrate a loss occurred during Fireman's policy period

8  remains for the jury. Ludwig's testimony evidences a genuine factual dispute about how and

9  when Eagle Harbour experienced its loss. He opines that from 1979 to 2014 wind-driven rain and

10 poor construction allowed water to penetrate Eagle Harbour's exterior. He suggests 60 storm

11 events caused new and increased damage, and Fireman's Fund bears responsibility for 5.6% of

12 that damage. It is for the jury to decide whether each storm event operated like a rock hitting and

13 cracking an already cracked windshield, or whether they had no new effect, and instead the water

14 damage operated like a single crack on a windshield that simply elongated over time. Fireman's

15 Motion for Summary Judgment [Dkt. #120] is DENIED.

16 **F.    Joint & Several Liability.**

17     Relatedly, the Association argues it need not identify which damage occurred during its

18 policy periods because the Defendants are joint and severally liable. St. Paul disagrees, arguing

19 the "continuous trigger rule" does not apply.

20     Each insurer of a risk during a time of ongoing damage has a joint and several obligation

21 to provide coverage for that damage. *See Windsong*, No. C08-00162-JCC, at *11 (citing *Am. Nat.*

22 *Fire Ins. Co. v. B & L Trucking & Const. Co.*, 134 Wn. 2d 413, 423, 951 P.2d 250, 254 (1998)).

23 "When damage is continuing, all triggered policies provide full coverage. Once coverage is

24

1  triggered in one or more policy periods, those policies provide full coverage for all continuing

2  damage, without any allocation between insurer and insured." *Travelers Prop. Cas. Co. of*

3  *America v. AF Evans Co.*, No. C10-1110-JCC, 2012 WL 12882902, at *3 (W.D. Wash. 2012)

4  (citing *B & L Trucking*, 134 Wn.2d at 429) (internal punctuation omitted). Whether a progressive

5  loss occurred during a policy period is a question of fact. *See Windsong*, at *11.

6      The Association claims an incremental and progressive loss, supported by expert

7  testimony. That proffer establishes a genuine issue of fact on whether the damage occurred

8  during each policy period, triggering coverage. If a jury concludes a progressive loss occurred

9  during a Defendant's policy period, the Defendant is jointly and severally liable for the

10  Association's continuing damage. It is then for the Defendants to sort liability amongst

11  themselves.

12                              **II.    CONCLUSION**

13      Questions of fact abound. The Motions for Summary Judgment [Dkt. ##120, 130, 131,

14  137, 139, and 141] are DENIED. The Court reminds the parties of its May 26, 2016 Order

15  directing them to participate in mediation before trial.

16      Dated this 10th day of April, 2017.

17

18                              _____
                                Ronald B. Leighton
19                              United States District Judge

20

21

22

23

24